## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| JOHN WASSERBECK *obo* L.W., | CASE NO. 3:22-cv-01497 |
| Plaintiff, | DISTRICT JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. |  |

Plaintiff John Wasserbeck *obo* L.W ("Plaintiff" or "Mr. Wasserbeck") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying Jacqueline Nicol Snyder's ("Claimant" or "Ms. Snyder")[1] applications for Medicare Qualified Government Employment Benefits ("MQGE") ("DIB") and Supplemental Security Income Benefits ("SSI").  (ECF Doc. 1; Tr. 17.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should provide a clear and accurate explanation in support of her findings as to the persuasiveness of the medical opinion evidence.

---

[1] On April 12, 2023, Mr. Wasserbeck *obo* L.W., a minor, was substituted as Plaintiff in this matter following Ms. Snyder's death on October 30, 2022.  (ECF Doc. 14; April 12, 2023 Non-Document Order.)

## I.     Procedural History

Ms. Snyder filed her applications for benefits on March 12, 2020, alleging a disability onset date of January 9, 2015.  (Tr. 17, 66, 76, 86, 87.)  She alleged disability due to depression, anxiety disorder, PTSD, degenerative disc disease, hip problem, anemia, gastritis, high blood pressure, sciatica, and osteoarthritis.  (Tr. 66, 76, 88, 97, 114, 119, 128, 131.)  Her applications were denied at the initial level (Tr. 110-19) and upon reconsideration (Tr. 124-31).  Following her request for a hearing (Tr. 133-34), a hearing was held before an Administrative Law Judge ("ALJ") on March 24, 2021 (Tr. 43-65).  The ALJ issued an unfavorable decision on May 5, 2021, finding Ms. Snyder had not been under a disability from January 9, 2015, the alleged onset date, through the date of the decision.  (Tr. 14-42.)  Ms. Snyder requested review of the decision by the Appeals Council.  (Tr. 214-16.)  The Appeals Council denied her request for review on June 24, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 2-8.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Snyder was born in 1974 and was forty-years old on her alleged disability onset date. (Tr. 32, 49.)  She completed high school (*id*.) and worked as a dispatcher (Tr. 32, 50-52, 60-61.)

### B.     Medical Evidence

Although Ms. Snyder has mental and physical impairments that were identified by the ALJ (Tr. 20), she only challenges the ALJ's decision regarding the medical opinion of her mental health provider Tracy Detwiler, PA-C (ECF Doc. 8, p. 3).  The evidence summarized herein is accordingly focused on evidence pertaining to her mental impairments.

### 1. Treatment History

Ms. Snyder presented to Coleman Professional Services ("Coleman") on February 4, 2016, for crisis counseling at the request of Coleman's Crisis Stabilization Unit ("CSU") staff. (Tr. 415-20, 491-94.)  She had been admitted to the CSU the prior evening for major depressive disorder, cocaine dependence, and alcohol dependence in remission.  (*Id*.)  She reported to Ruth Buck, R.N. that she felt shame over losing her children due to addiction.  (Tr. 492.)  She also reported no motivation, problems sleeping, increased anger and irritability, suicidal thoughts, feeling overwhelmed and hopeless, and problems with her mother.  (Tr. 492-93.)  On mental status examination, she was cooperative but unkempt.  (Tr. 491.)  Her demeanor, eye contact, and activity were average.  (*Id*.)  Her speech was clear.  (*Id*.)  She was not smiling.  (*Id*.)  She was depressed, sad, crying, anxious, and preoccupied.  (*Id*.)  Her affect was constricted, but with logical thought processes.  (Tr. 491-92.)  She reported fleeting suicidal thoughts but denied any intent or plan.  (Tr. 492.)

Ms. Snyder returned to RN Buck on February 11, 2016 after being discharged from CSU the prior week.  (Tr. 495.)  She reported doing better, but also reported multiple stressors, including legal and familial problems.  (Tr. 495.)  On mental status examination, she was well-groomed and cooperative.  (*Id*.)  Her demeanor, eye contact, and activity were average.  (*Id*.)  Her speech was clear and she was bright, calm, and smiling.  (*Id*.)  Her affect was full, with logical thought processes.  (Tr. 495-96.)  Her attention and concentration were not impaired.  (Tr. 496.)  RN Buck observed that Ms. Snyder looked much better than she did during their session the prior week.  (Tr. 495.)  Ms. Snyder was stable and compliant with her medications, which included Celexa, Trazadone, Buspar, and Vistaril.  (Tr. 496.)

Ms. Snyder returned to RN Buck on February 18, 2016 (Tr. 499-502) and presented for her first counseling session with Christina Hampshire, LSW at Coleman on March 3, 2016 (Tr. 503-06).  She was cheerful, euthymic, and talkative during her March 3, 2016 counseling session.  (Tr. 503.)  She was well-groomed and cooperative with clear speech.  (*Id*.)  Her affect was full. (*Id*.)  Her thought process was logical but circumstantial.  (Tr. 504.)  There were no reported attention or concentration deficits.  (*Id*.)  There was no reported suicidal ideation.  (*Id*.)  Ms. Snyder continued to receive mental health treatment and counseling at Coleman throughout 2016 and until April 2017.  (Tr. 415-708.)

On March 9, 2017, Ms. Snyder was admitted to the CSU due to acute exacerbation of anxiety, depression, suicidal ideation, hopelessness, and helplessness.  (Tr. 595-608, 670.)  She reported that she was under severe stress.  (Tr. 658.)  Her husband was still incarcerated and she was living with her mom.  (Tr. 595, 658.)  She reported that her mother had bailed her out of jail following a robbery and theft charge in December 2015.  (Tr. 595, 623.)  She continued to report relationship problems with her mother.  (Tr. 595.)  She also reported being off her mental health medications for two to three months and using crack two days earlier.  (*Id*.)  She was restarted on her medications, including Celexa for depression, Buspar for anxiety, Trazadone for sleep, and Vistaril as needed for breakthrough anxiety.  (Tr. 656.)

She attended a psychiatric office visit with Subrata Roy, M.D., while admitted to the CSU on March 20, 2017.  (Tr. 670-74.)  On mental status examination, she was alert, oriented, and cooperative.  (Tr. 670-71.)  Her speech was low volume and goal directed.  (*Id*.)  She was anxious with a reactive affect.  (*Id*.)  She denied suicidal or homicidal ideation.  (*Id*.)  Her judgment and insight were limited.  (*Id*.)  Dr. Roy recommended that she continue her current medication and planned to discharge her the following day with outpatient follow up.  (Tr. 670.)

Ms. Snyder was admitted again to the CSU on April 12, 2017 due to acute exacerbation of anxiety, depression, and mood swings.  (Tr. 609-22, 686.)  She reported that she was using drugs to self-medicate to deal with relationship problems with her mother.  (Tr. 686.)  She was restarted on her medications, which included Celexa, Buspar, Clonidine, Trazadone, and Vistaril. (Tr. 681.)  On April 14, 2017, Dr. Roy increased her Vistaril and Buspar for anxiety.  (*Id.*)  On April 17, 2017, Dr. Roy diagnosed her with bipolar disorder and cocaine use disorder.  (Tr. 686.) She was compliant with her medication.  (*Id*.)  On mental status examination, she was alert, oriented, and cooperative, and her speech was low volume and goal directed.  (Tr. 686, 688.) She was anxious with a guarded affect and limited judgment and insight.  (*Id*.)  She denied suicidal or homicidal ideation.  (*Id*.)  Dr. Roy recommended that she continue with her current medication and planned to discharge her the following day with outpatient follow up.  (Tr. 686.)

Ms. Snyder was booked in Summit County jail on May 15, 2017 (Tr. 1893) and released on or about May 31, 2017 (Tr. 1892).

Ms. Snyder presented to the emergency room at MercyHealth on August 19, 2017, stating she took a handful of Trazadone and two Vicodin, and that she felt depressed and did not want to live.  (Tr. 2195.)  On examination, Ms. Snyder appeared labile with a depressed mood.  (Tr. 2197.)  Her judgment was normal.  (*Id*.)  She was admitted due to suicidal behavior with attempted self-injury and diagnosed with depression with suicidal ideation.  (Tr. 2199, 2203.) She was discharged on August 30, 2017 in stable condition.  (Tr. 2203-06.)

Ms. Snyder returned to Summit County jail for at least part of 2018 and through February 2019.  (Tr. 1792-1930.)  County jail records indicate that Ms. Snyder received mental health treatment and medication while incarcerated.  (*See, e.g.*, Tr. 1814, 1817, 1827-29, 1836, 1861-62, 1866-67, 1871, 1899.)

Ms. Snyder was admitted to the Ohio Hospital for Psychiatry on September 19, 2019 due to suicidal ideation with a plan to overdose on medication.  (Tr. 786.)  She had been off her mental health medications for one month, and reported feeling hopeless, guilty, and suicidal. (Tr. 784.)  She was treated and discharged on September 23, 2019.  (Tr. 784-91.)  On mental examination at the time of her discharge, she was cooperative with normal thought content, concentration, memory, and speech.  (*Id.*)  She reported no suicidal or homicidal ideations, but was depressed with a restricted affect.  (*Id.*)  Her insight and judgment were fair.  (*Id.*)  She was diagnosed with bipolar disorder and post-traumatic stress disorder.  (Tr. 785.)  Her medications included Risperdal, Lexapro, BuSpar, and Prazosin.  (*Id.*)

On October 28, 2019, Ms. Snyder presented to Jordan D. Thurman at Community Health & Wellness Partners ("Community Health").  (Tr. 2075-81.)  She reported that she was living in a homeless shelter.  (Tr. 2079.)  She had no transportation and lost her job at Tim Horton's after her hospitalization a month and a half earlier.  (*Id.*)  She said she noticed that her symptoms and suicidal thoughts returned quicker than they had in the past if she was without her medication. (*Id.*)  On mental status examination, Ms. Snyder was alert and oriented.  (*Id.*)  Her mood was described as anxious due to rocking in her chair and her own reports.  (*Id.*)  Her affect was tearful throughout the appointment when she talked about losses and traumatic experiences.  (*Id.*) Her affect appeared flat throughout the appointment, with occasional "small laughs."  (*Id.*)  Her thought process was circumstantial but she reported no suicidal or homicidal ideation for the past month and a half.  (Tr. 2080.)  She was cooperative with appropriate appearance and eye contact, normal speech, and good insight and judgment.  (Tr. 2079.)  She was diagnosed with: PTSD; methamphetamine use disorder, mild, in early remission; and major depressive disorder, single

episode, moderate degree. (Tr. 2080.) She was referred to psychiatry and advised to follow up with behavioral health to develop further coping skills. (*Id.*)

Ms. Snyder presented to Tracy Detwiler, PA-C, at Community Health on November 7, 2019 for an initial psychiatric evaluation. (Tr. 799.) She said she felt "kinda blah but better than last month," and reported that she was there was medication refills. (*Id.*) On examination, she was well-groomed and smiled and laughed appropriately. (Tr. 801-02.) Her eye contact was good and she was not tearful or irritable. (Tr. 802.) Her attention and concentration were good. (*Id.*) She was pleasant and cooperative. (*Id.*) Her speech was normal. (*Id.*) Her mood was "okay." (*Id.*) Her affect was full-range and she had coherent, linear, logical, and goal-oriented thought processes. (*Id.*) Her recent and remote memory was intact. (*Id.*) Her cognition was average and her judgment and insight were fair. (*Id.*) She reported no suicidal or homicidal ideation. (*Id.*) She was diagnosed with: major depressive disorder, single episode, moderate degree; PTSD; borderline personality disorder; and substance abuse disorders. (*Id.*) PA Detwiler prescribed Lexapro, Prazosin, Buspar. (Tr. 802-04.)

Ms. Snyder returned to PA Detwiler on December 3, 2019 for a behavioral health follow-up. (Tr. 807.) She reported her mood was "good." (*Id.*) She denied suicidal ideation and said she was not having night terrors. (*Id.*) Mental examination findings were similar to those from the November 2019 appointment with PA Detwiler. (*Compare* Tr. 807-08 *with* Tr. 801-02.) Her medications were continued. (Tr. 808-09.)

She next attended a behavioral health follow-up appointment with PA Detwiler on March 5, 2020. (Tr. 823.) She reported feeling anxious, explaining that her daughter was trying to get out of unsafe domestic situation. (*Id.*) She said her appetite had increased due to the stress over her daughter. (*Id.*) She was sleeping four to six hours each evening. (*Id.*) She denied suicidal

ideation.  (*Id*.)  Mental examination findings were similar to examination findings during past appointments with PA Detwiler, although her mood was noted to be "anxious," not "okay." (*Compare* Tr. 824 *with* Tr. 807-08, 801-02.)  PA Detwiler continued Lexapro and Buspar, and increased Prazosin.  (Tr. 824-25.)

Ms. Snyder presented for a behavioral health tele-medicine appointment with PA Detwiler on April 10, 2020.  (Tr. 831.)  She reported she was not able to tolerate the increase in Prazosin because it caused dizziness.  (*Id*.)  She said that her stress levels were "way down," and said she felt "pretty peaceful."  (*Id*.)  She was setting boundaries with her daughter and staying with her mother.  (*Id*.)  Her appetite was improved and she was sleeping four to twelve hours nightly.  (Tr. 832.)  She denied suicidal ideation.  (*Id*.)  She reported that she was applying for social security disability benefits, stating that she was "unable to tolerate the stress of employment for being in a crowd with work demands."  (Tr. 831-32.)  Mental examination findings were similar to examination findings during past appointments with PA Detwiler, except that her appearance was not observed and her mood was noted to be "calm," rather than "okay" or "anxious."  (*Compare* Tr. 832 *with* Tr. 807-08, 801-02, 824.)  Ms. Snyder's prescriptions were continued, with her Prazosin being decreased to the prior dose.  (Tr. 832-33.)

Ms. Snyder next attended a tele-medicine appointment with PA Detwiler on June 19, 2020.  (Tr. 838.)  She reported that her mood had been "ok" with "some situational anxiety if [her] [adult] daughter [was] having [an] outburst."  (Tr. 839.)  She reported some fatigue, which she felt was related to ongoing medical issues, and a low appetite.  (*Id*.)  She denied suicidal ideation.  (*Id*.)  Her mental examination findings were similar to her prior examination findings, except her mood was "okay," as compared to "calm" at the prior visit.  (*Compare* Tr. 839 *with* Tr. 832.)  Ms. Snyder's medications were continued.  (Tr. 840.)

On September 8, 2020, Ms. Snyder presented for a tele-medicine appointment with PA Detwiler.  (Tr. 2018.)  She reported a flare-up in her PTSD symptoms, starting about two months earlier.  (Tr. 2019.)  She was avoiding stores because wearing a facemask was increasing her anxiety.  (*Id*.)  She was tired and not sleeping well.  (*Id*.) She reported that she felt down, her motivation was low, and she was isolating in her bedroom.  (*Id*.)  She also reported having flashbacks of trauma triggered by smells and riding in a car.  (*Id*.)  She was staying with her mother.  (*Id*.)  She reported that her appetite was still low, and she was having nightmares four times each week.  (*Id*.)  She denied suicidal ideation, and denied using alcohol or drugs.  (*Id*.) She said she was taking Valium prescribed by her orthopedic surgeon, which had been "mildly effective for [her] anxiety."  (*Id*.)  On mental status examination, her attention and concentration were good.  (*Id*.)  She was pleasant and cooperative.  (*Id*.)  She was not tearful or irritable.  (*Id*.) Her speech was normal.  (*Id*.)  Her mood was noted as: "no[t] real good, I'm here."  (Tr. 2020.) Her affect was mildly dysphoric.  (*Id*.)  She had coherent, linear, logical, and goal-oriented thought processes.  (*Id*.)  Her recent and remote memory was intact.  (*Id*.)  Her cognition was average, and her judgment and insight were fair.  (*Id*.)  She reported no suicidal or homicidal ideation.  (*Id*.)  PA Detwiler started Ms. Snyder on Wellbutrin XL and continued her prescriptions for Lexapro, Buspar, and Prazosin.  (Tr. 2020-21.)

Ms. Snyder next returned to PA Detwiler for a tele-medicine visit on October 23, 2020. (Tr. 2013.)  She reported that she felt her PTSD was "now under control and she [was] functioning well at home and [felt] she [was] able to function in the community."  (Tr. 2014.) She said that she was "functioning better in the stores and focusing on what she need[ed] and then [leaving]."  (*Id*.)  She did not "feel as hypervigilant in public."  (*Id*.)  She reported that her appetite had improved, but she was still having nightmares twice per week.  (*Id*.)  She denied

suicidal ideation, and denied alcohol and drug use. (*Id*.) Mental examination findings were similar to the prior appointment, except her mood was "good" and she had a full-range of affect. (*Compare* Tr. 2014 *with* Tr. 2020.) PA Detwiler continued her prescriptions. (Tr. 2014-16.)

### 2. Opinion Evidence

#### i. Mental Capacity Assessment

On May 7, 2020, PA Detwiler completed a Mental Capacity Assessment, where she rated Ms. Snyder's degree of limitation resulting from psychological factors. (Tr. 793-96.) The available ratings were: none, mild, moderate, marked, and extreme, with an option to select unknown if unable to assess limitations based on examinations or a medical record review. (Tr. 794.) PA Detwiler indicated that Ms. Snyder had been diagnosed with: major depressive disorder; post-traumatic stress disorder; borderline personality disorder; alcohol use disorder in sustained remission; and methamphetamine use in sustained remission. (Tr. 794.)

In the category of *understanding, remembering, or applying information*, PA Detwiler opined that Ms. Snyder had:

- *mild* limitations in her ability to follow one- or two-step oral instructions to carry out a task, or sequence multi-step activities; and

- *extreme* limitations in her ability to use reason and judgment to make work-related decisions.

(Tr. 794.) PA Detwiler checked the "unknown" box as to ability to recognize a mistake and correct it, or identify and solve problems. (*Id*.) As support for her ratings in this category, PA Detwiler stated that Ms. Snyder "attempted to work [in] September 2019 at Tim Horton's and left job after [a] month due to anxiety." (*Id*.)

In the category of *concentration, persistence, or maintaining pace*, PA Detwiler opined that Ms. Snyder had:

- *mild* limitations in her ability to initiate and perform a task she knows how to do, work at an appropriate and consistent pace, or complete tasks in a timely manner;

- *moderate* limitations in her ability to work closely with others without interrupting or distracting them;

- *marked* limitations in her ability to ignore or avoid distractions while working, or to sustain an ordinary routine and regular attendance at work; and

- *extreme* limitations in her ability to work a full day without needing more than the allotted number or length of rest periods during the day.

(Tr. 795.)  As support for her ratings in this category, PA Detwiler stated that Ms. Snyder was "unable [to] tolerate employment in the past which involved fast pace."  (*Id*.)

In the category of *adapting or managing oneself*, PA Detwiler opined Ms. Snyder had:

- *no* limitations in her ability to: make plans independently of others; maintain personal hygiene and attire appropriate to a work setting; and be aware of normal hazards and take appropriate precautions;

- *mild* limitations in her ability to distinguish between acceptable and unacceptable work performance, or to set realistic goals; and

- *marked* limitations in her ability to adapt to changes or manage psychologically based symptoms.

(Tr. 795.)  As support for her ratings in this category, PA Detwiler stated that Ms. Snyder had a "history of 3-4 suicide attempts by overdose in 2017" and a [h]istory of 5 psychiatric hospital admissions to keep her safe from herself."  (*Id*.)

In the category of *interacting with others*, PA Detwiler opined that Ms. Snyder had:

- *marked* limitations in her ability to: cooperate with others, or ask for help when needed; understand and respond to social cues; or respond to requests, suggestions, criticism, correction and challenges; and

- *extreme* limitations in her ability to handle conflicts with others, or keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

(Tr. 796.)  As support for her ratings in this category, PA Detwiler stated that Ms. Snyder's depression increased in March 2020 "due to more frequent interaction with her daughter." (*Id*.) PA Detwiler also indicated that Ms. Snyder had "low tolerance for an environment with people who [were] not emotionally or mentally well." (*Id*.)

### ii.    State Agency Psychological Consultants

State agency psychological consultant Aracelis Rivera, Psy. D., reviewed the record on initial review on July 7, 2020 and completed a Psychiatric Review Technique ("PRT") and mental residual functional capacity ("MRFC"). (Tr. 70, 73-74.)  In the PRT, Dr. Rivera opined that Ms. Snyder had: no limitations in her ability to understand, remember, or apply information; a mild limitation in her ability to concentrate, persist, or maintain pace; and moderate limitations in her ability to interact with others and adapt or manage oneself.  (Tr. 70.)  In the MRFC, Dr. Rivera opined that Ms. Snyder had the capacity to: relate on a superficial basis with coworkers and supervisors; have minimal interactions with the general public; and work in a relatively static environment where job demands are routine and predictable in nature.  (Tr. 73-74.)

State agency psychological consultant Jennifer Swain reviewed the record on reconsideration on October 20, 2020.  (Tr. 100, 103-04.)  She affirmed Dr. Rivera's PRT and MRFC findings. (*Id*.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Ms. Snyder testified at the March 24, 2021 hearing that she was recently married and lived with her husband.  (Tr. 49-50.)  She had two minor children who did not live with her full time.  (Tr. 50.)  She had lived with her mother on and off for health reasons.  (*Id*.)  She had a driver's license but did not drive often because of sitting limitations due to her back problems.

(Tr. 50.)  She said that driving caused her PTSD and anxiety to flare up because of a prior car accident.  (*Id*.)  She also said she left her dispatcher job because she could not handle it emotionally.  (Tr. 51.)

Ms. Snyder said that she was diagnosed with anxiety and depression almost twenty years earlier and diagnosed with PTSD around the time she quit her dispatcher job, which occurred in 2015.  (Tr. 53, 54, 312.)  She reported participating in two rehabilitation programs for substance abuse and said she had not used drugs since 2019.  (Tr. 54-55.)

Ms. Snyder testified that she had problems remembering things and concentrating.  (Tr. 55.)  When asked whether she had "any issues getting along with others," Ms. Snyder responded:

> I just prefer not, and prefer to, kind of, stay to myself.  I don't have any issues, like, getting along with people, but I do have my anxiety, kind of, it gets really bad, and so I don't like to be around a lot of people.  I like to just kind of stay to myself.

(*Id*.)  She had prior suicide attempts and reported off and on suicidal thoughts since 2017, but she explained that those thoughts were "not really an issue" if she took her antidepressant.  (Tr. 56.)  She said that it was her anxiety and PTSD that "really act[ed] up."  (*Id*.)   She later testified that she had issues being around coworkers, supervisors, and the public in a work setting due to her mental health issues, stating:

> My anxiety gets really bad, and I have, like, panic attacks; I --I can't breathe.  I am -- I don't even defend it most of the time because I know how its going to end up.  My PTSD, like if I'm in [a] car, I have flashbacks of being in a wreck.  Just a constant fear that something bad is going to happen if I'm, like, out around people I don't know.

(Tr. 58.)  She said that she left her job at Tim Horton's after working for only a short period because of her back pain, but also because of: "my panic attacks; I couldn't deal with being in the public."  (*Id*.)

13

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 59-65.) The VE classified Ms. Snyder's past work as a dispatcher as a skilled, sedentary job. (Tr. 60-61.) The ALJ asked the VE several different hypotheticals. (Tr. 61-64.) In response to a hypothetical that described an individual with the sedentary RFC ultimately assessed by the ALJ, the VE testified that the individual would not be able to perform Ms. Snyder's past work but there were other jobs that the individual could perform, including inspector, document preparer, and bench assembler. (Tr. 23, 61-63.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.      The ALJ's Decision

In her May 5, 2021 decision, the ALJ made the following findings:[3]

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2021. (Tr. 19.)

2.      The claimant has not engaged in substantial gainful activity since January 9, 2015, the alleged onset date. (*Id.*)

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[3] The ALJ's findings are summarized.

3.      The claimant has the following severe impairments: degenerative disc disease lumbar spine, status post fusion surgery; anemia; major depressive disorder; generalized anxiety disorder; borderline personality disorder; substance abuse disorder including cocaine, alcohol, and methamphetamines; and post-traumatic stress disorder.  (Tr. 20.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 20-23.)

5.      The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; should avoid workplace hazards such as unprotected heights and dangerous moving machinery; should not operate bilateral foot controls such as pedals; should not work in conditions of vibrations or in temperature extremes such as extreme heat and/or cold and humidity and/or wetness; is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work; is limited to occasional changes in the workplace that are well explained; is limited to occasional interaction with supervisors, coworkers, and the general public; and there should be no tandem work.  (Tr. 23-32.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 32.)

7.      The claimant was born in 1974 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability date.  (*Id.*)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not material to the determination.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including inspector, document preparer, and bench assembler.  (Tr. 33.)

Based on the foregoing, the ALJ determined that Ms. Snyder had not been under a disability from January 9, 2015, through the date of the decision.  (Tr. 34.)

## V.    Plaintiff's Argument

Plaintiff's sole assignment of error is that the ALJ failed to properly evaluate the opinion of PA Detwiler.  (ECF Doc. 8, pp. 3, 12-21; ECF Doc. 10, pp. 1-3.)

16

## VI.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**     **Sole Assignment of Error: Whether ALJ Properly Evaluated PA Detwiler's Opinion**

Plaintiff argues that the ALJ failed to properly evaluate the opinion of PA Detwiler. (ECF Doc. 8, pp. 3, 12-21; ECF Doc. 10, pp. 1-3.)[4]  The Commissioner responds that substantial evidence supports the ALJ's evaluation the PA Detwiler's opinion.  (ECF Doc. 9, pp. 8-14.)

**1.**     **Regulations Regarding Evaluation of Medical Opinions**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

---

[4] Plaintiff asserts in a general and cursory manner that the limitations contained in PA Detwiler's opinion support a finding that Ms. Snyder's mental health impairment is of listing level severity and therefore should have resulted in a favorable finding at Step Three.  (ECF Doc. 8, p. 14; ECF Doc. 10, p. 1.)  The undersigned finds any attempt to raise an independent Step Three challenge is waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995 ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")

The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2). ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

### 2. Whether ALJ Properly Evaluated Persuasiveness of PA Detwiler's Opinion

In finding PA Detwiler's opinion not persuasive, the ALJ explained:

The undersigned finds the opinion of Mrs. Detwiler to be unpersuasive. In making this finding, the undersigned notes that Mrs. Detwiler's opinion is inconsistent with the most recent treatment notes from the Community Health and Wellness Center, which show that she has been responsive to counseling services and able to work with a therapist, psychiatrist, and Case Manager. Additionally, the undersigned notes that the opinion of Mrs. Detwiler is inconsistent with the claimant's own statements at the hearing and in the adult function reports, which indicate that she is able to maintain close relationships with others in the community, cooperate with

19

others, understand and respond to social cues, and interact appropriately when necessary. Therefore, based upon the foregoing, the undersigned finds the opinion of Mrs. Detwiler to be unpersuasive.

(Tr. 30.)

Plaintiff contends that the ALJ's decision cannot be affirmed, arguing that the decision lacks a logical bridge because the ALJ failed to support her persuasiveness determination with citations to the record and because the ALJ failed to logically explain her two stated reasons for finding PA Detwiler's opinion unpersuasive.

To articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  She may also rely on information articulated earlier in the decision to support his persuasiveness determination, and is not required to rearticulate that information in the opinion discussion.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").  Thus, the undersigned concludes that the ALJ's lack of specific citations in the ALJ's persuasiveness determination is not alone a basis to order remand.

The undersigned turns to the Plaintiff's more specific challenges to the ALJ's evaluation of the persuasiveness of PA Detwiler's opinion.

### i.  Whether ALJ's First Stated Reason for Finding PA Detwiler's Opinion Unpersuasive was Supported by Substantial Evidence

Plaintiff argues that "[i]t is unclear from a review of [the] [most recent] records how the ALJ reached her determination that 'Mrs. Detwiler's opinion [was] inconsistent with the most recent treatment notes from the Community Health and Wellness Center, which show that she [had] been responsive to counseling services and able to work with a therapist, psychiatrist, and Case Manager.'"  (ECF Doc. 8, p. 18.)  Plaintiff contends that the most recent treatment records show that Ms. Snyder's "mental health was at times improved and at times more severe, despite her continued compliance and treatment with PA Detwiler," and that her "treatment compliance does not demonstrate that PA Detwiler's opinion[s] are 'inconsistent[.]'" (*Id*.)  Instead, Plaintiff argues the records show PA Detwiler had the "opportunity to see Ms. Snyder at both her best and worst symptoms, and having so observed her, she opined extreme and marked limitations."  (*Id*.)

Prior to analyzing the persuasiveness of PA Detwiler's opinion, the ALJ detailed and considered Ms. Snyder's mental health treatment records, including her treatment records with PA Detwiler at the Community Health and Wellness Center.  (Tr. 27-29.)  The ALJ explained:

> In October 2019, the claimant was enrolled in services at the Community Health and Wellness Center as part of her follow up for mental health services. (Ex. 23F, p. 69-75). During the assessment, she reported ongoing symptoms of anxiety, tearfulness, and depression. She also reported ongoing post-traumatic symptoms and was described as tearful at times. (*Id.*, p. 73). Following the preliminary assessment, she was diagnosed with PTSD and mild methamphetamine use disorder in early remission, and with moderate major depression. (*Id.*, p. 74). For treatment, she was continued on medications and was recommended for supportive counseling. (*Id.*, p. 74-75). A review of her progress reports show that she continued to endorse symptoms of depressed mood, sleep disturbances, feelings of guilt and hopelessness, poor concentration, and low energy levels. (Ex. 8F, p. 3). The records also show that the diagnosis of borderline personality disorder was added to the record in November 2019. (*Id.*, p. 7). However, progress reports show that despite her limitations, she was able to establish rapport, work with a therapist, and comply with a medication regimen, which she described as improving her mood. (*Id.*, p. 11-14). Her records also show that she was started on Gabapentin for her restless leg syndrome, which improved her sleep. (*Id.*, p. 15-17). Although progress reports

21

> show that she continued to have waxing and waning symptoms, she did not require
> re-admission to the hospital for her symptoms. (Ex. 22F and 23F). Treatment notes
> from October 2020 also described her PTSD as "under control," and indicate that
> she "is functioning well at home and feels [that] she is able to function in the
> community." (Ex. 22F, p. 8).

(Tr. 28-29.) Thus, it is evident that the ALJ did not ignore or fail to cite to Ms. Snyder's mental

health treatment records in support of her analysis. She described the nature of treatment Ms.

Snyder was receiving at the Community Health and Wellness Center, as well as her diagnoses,

her reported symptoms, her medications, and her providers' clinical findings on examination.

(Tr. 28-29.) Plaintiff does not argue that the ALJ's discussion of these records is inaccurate or

mischaracterizes the records, and no such inaccuracy is evident from an independent review.

In the context of the ALJ's discussion of Ms. Snyder's treatment records at Community

Health and Wellness Center, the undersigned finds that substantial evidence supported the ALJ's

finding that the significant limitations described in PA Detwiler's opinion were inconsistent the

treatment records of her own facility "which show[ed] that [Ms. Snyder] has been responsive to

counseling services and able to work with a therapist, psychiatrist, and Case Manager." (Tr. 30.)

The undersigned accordingly finds that the ALJ's first stated reason for finding PA Detwiler's

opinion unpersuasive is supported by substantial evidence and builds an accurate and logical

bridge between the evidence and the result.

ii.     **Whether ALJ's Second Stated Reason for Finding PA Detwiler's Opinion Unpersuasive was Supported by Substantial Evidence**

Plaintiff argues that the ALJ failed to provide sufficient explanation or evidentiary

support for her conclusion that PA Detwiler's opinion was "inconsistent with the *claimant's own

statements at the hearing and in the adult function report*, which indicate that she is able to

maintain close relationships with others in the community, cooperate with others, understand and

respond to social cues, and interact appropriately when necessary." (ECF Doc. 8, p. 20

22

(emphasis added).)   Plaintiff asserts that Ms. Snyder's hearing testimony "primarily consisted of her explaining that she does not like to be in public around others, that her anxiety and PTSD are still severe and that her medication has helped *reduce* her suicidal ideations." (*Id*. (citing Tr. 54-56) (emphasis in Plaintiff's Brief)).)   Plaintiff contends further that "[a]t no point did [Ms. Snyder] testify that she maintained close relationships, cooperated with others, understood and responded to social cues, or interact appropriately when necessary." (*Id*.)

Upon reviewing the ALJ decision as a whole, the undersigned finds the ALJ's second stated reason for finding PA Detwiler's opinion unpersuasive lacks the support of substantial evidence and fails to build an accurate and logical bridge between the evidence and the result.

First, the ALJ concluded that PA Detwiler's opinion was not consistent with Ms. Snyder's "own statements at the hearing." (Tr. 30.)  Ms. Snyder testified that she was recently married and lived with her husband. (Tr. 49-50.)  She testified that she did not live with her minor children on a full-time basis and lived "off and on" with her mother. (Tr. 50.)  Although she testified that she did not have "issues, like, getting along with people," (Tr. 55), she also testified that she stayed to herself and being around other people was anxiety provoking. (Tr. 55, 58.)  She explained that she left a job at Tim Horton's shortly after starting there, stating: "my panic attacks; I couldn't deal with being in the public." (Tr. 58.)  Given this limited testimony, the undersigned cannot identify substantial evidence or a logical bridge to support the ALJ's conclusion that Ms. Snyder's hearing testimony "indicate[d] that she [wa]s able to maintain close relationships with others in the community, cooperate with others, understand and respond to social cues, and interact appropriately when necessary." (Tr. 30.)

Second, the ALJ concluded that PA Detwiler's opinion was not consistent with Ms. Snyder's statements "in the adult function report." (Tr. 30.)  However, the ALJ failed to cite or

otherwise identify what adult function report she was referring to.  (*Id*.)  The Court is not required to scour the record in search of records to support an ALJ's decision.  *See Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011) ("It is not . . . the district court's role, to scour the record for evidence and expert reasoning which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it.") (emphasis in original).  A review of the ALJ's step three determination does reveal that the ALJ cited certain disability reports in support her step three findings, but did not identify or cite to any adult function reports.  (Tr. 21-22, 310-19, 330-37, 338-345.)  Indeed, an independent review of the evidentiary record did not identify any adult function reports completed by Ms. Snyder.

The ALJ's intent in referencing an "adult function report" is not clarified through a review of the disability reports cited by the ALJ in her step three analysis.  Of the three disability reports cited by the ALJ, two do not contain any subjective statements from Ms. Snyder regarding her mental conditions.  (Tr. 310-19, 338-45.)  The third cited disability report contains only the following statements:

> My PTSD and anxiety are much worse. I cannot ride in a car for more than a few miles without flashbacks of hitting a utility pole and it is very hard to be around people. Wearing a mask feels very suffocating and sets off my anxiety. It is harder to leave the house.
>
> . . .
>
> It is almost impossible for me to be in public especially having to wear a face mask. I cannot breathe and I panic. . . .

(Tr. 331, 335.)

As with Ms. Snyder's hearing testimony, the undersigned cannot identify evidence in the record which supports the ALJ's conclusion that Ms. Snyder's own statements – either in an unidentified "adult function report" or in the disability report containing the above subjective statements – "indicate[d] that [Ms. Snyder] [wa]s able to maintain close relationships with others

24

in the community, cooperate with others, understand and respond to social cues, and interact appropriately when necessary."  (Tr. 30.)

In cases where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, courts have routinely held that the ALJ erred by failing to build an accurate and logical bridge between the evidence and the result.  *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

Here, the ALJ based her analysis in part on records and testimony that she did not clearly identify.  Even an independent review does not reveal records to support the explanation and conclusions drawn by the ALJ.  Accordingly, the undersigned finds that remand is warranted because the ALJ's evaluation of PA Detwiler's medical opinion fails to build "an accurate and logical bridge between the evidence and the result." *See Fleischer*, 774 F. Supp. 2d at 877.

## VII.    Recommendation

For the reasons set forth above, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should provide a clear and accurate explanation in support of her findings as to the persuasiveness of the medical opinion evidence.

July 20, 2023                                   /s/ Amanda M. Knapp
                                         _____
                                         AMANDA M. KNAPP
                                         UNITED STATES MAGISTRATE JUDGE


### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 Dated: April 17, 2023(1985).

26